IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    )
         )
v.                    )     Case No. 1:21-CR-00231-TCB-CMS
         )
JAMES SINNOTT         )

## UNITED STATES' SENTENCING MEMORANDUM

"Does Jack know we are doing this via email? I am under the impression he wants it [*sic*] all the initial paperwork for SPA 2 to go through Sinnott & Co or to be done over the phone and via paper…."[1]

From 2013 through at least 2020, defendant James Sinnott used his training and skills as an attorney to help co-conspirator Jack Fisher create and sell illegal tax shelters based on charitable contributions of land and conservation easements, and to conceal the true nature of the shelters from the IRS. But Sinnott, Fisher, and their co-conspirators were not motivated by charitable desires—they were motivated by greed. And for most of a decade, Sinnott and others committed fraud dressed up as a charitable contribution. Year after year, Sinnott and his co-conspirators repeatedly lied to the IRS, creating false and misleading paperwork, filing false tax returns, assisting in the creation of false appraisals, selling false tax deductions, and plundering the U.S. Treasury of hundreds of millions of dollars.

---

[1] Gov. Exh. 47-21 (March 15, 2019, email by co-conspirator discussing late subscriber) (ellipsis in original).

1

Sinnott knew all along that what he was doing was fraudulent, but he thought they could get away with it. In the words of co-conspirator Stein Agee, they thought they "wouldn't get caught" because they were "invincible." Trial Tr. July 31, 2023, vol. 12 PM at 30:2–3. To conceal their criminal conduct from government scrutiny, Sinnott and others created backdated documents, produced misleading marketing materials, and abused the attorney-client privilege. After search warrants were executed, he and his co-conspirators were undeterred, claiming an additional $138 million in false tax deductions. Even after being indicted, Sinnott filed *another* false personal tax return.

Sinnott's conduct results in a U.S. Sentencing Guidelines range of life imprisonment. His total statutory maximum prison sentence is 91 years. Given his long-standing unrelenting conduct and his abuse of his position as a licensed attorney, the United States respectfully requests that the Court sentence Sinnott to a term of imprisonment of no less than 28 years.

## BACKGROUND

## I.    Factual Summary of Sinnott's Criminal Conduct

Any sentencing memorandum cannot possibly encompass all of Sinnott's criminal conduct, which was broad, brazen, and egregious. And after a lengthy trial resulting in Sinnott's conviction on all counts, this Court is no doubt familiar with the facts of this case. The United States submits this sentencing memorandum to

2

highlight particularly grievous conduct that supports its sentencing recommendation.

## A.    Backdating from the Beginning

"…both of these amounts [lowers voice] *effectively happened after the first of the year,* [laughs] which technically shouldn't happen, but, you know."[2]

Sinnott joined the conspiracy in 2013 and was immediately involved in backdating documents to deceive the IRS. He went so far as to furtively set up (using his then-wife's name and using a falsely backdated operating agreement) an entity to house the unsold units in their 2013 shelter so that they could keep selling them in 2014 knowing that all these sales would involve and require backdated documents. Trial Tr. July 26, 2023, vol. 9 AM at 41:17–20, 61:3–64:6; Gov. Exh. 56-56. And the backdating never stopped. *See e.g.*, Gov. Exh. 42-40 (Sinnott texting witness on Feb. 6, 2019, saying they "need a check. Dated last year."). In total, Fisher and Sinnott collected over $40 million from clients after the close of the relevant tax years. Gov. Exh. 5-6.

### i.    Abuse of Attorney-Client Privilege to Hide Backdating

"I'm more of his business partner than his attorney. . . . I'm a reformed attorney is what we like to call it. . . . But it's nice to have attorney-client privilege every once in a while."[3]

True to his word, by at least as early as 2019, Sinnott and his co-conspirators

---

[2] Gov. Exh. 34-1-C (Sinnott to whistleblower on February 25, 2015).
[3] Gov. Exh. 1-2-A-1 (Sinnott to undercover agent on November 15, 2018).

had hatched a scheme to abuse the attorney-client privilege to hide documents from the IRS. In 2019 (as in other years), the defendants were selling late subscriptions to high-income clients who wanted to buy units in their abusive tax shelter. To simplify tracking the large volume of late subscribers to Southeast Property Acquisitions (a 2018 Fund Company), the co-conspirators created a new tab in their Master Tracker spreadsheet called "SPA 2." *See* Gov. Exhs. 22-176, 52-5, 52-6. But the defendants were concerned about the IRS learning of these late subscribers purchasing units in 2019 but claiming deductions on their 2018 tax returns, and because the IRS "ask[s] for all the fucking emails now," they devised a scheme to avoid detection. Gov. Exh. 34-3-D. Not only would the participants backdate documents, but Sinnott and his co-conspirators avoided IRS detection by abusing the attorney-client privilege, and instead of sending emails as usual, they conspired to discuss the scheme by phone only, and to use the mails and house the documents at Sinnott's purported law firm, Sinnott & Co. Gov. Exh. 47-21. Sinnott did not have any attorney-client relationship with the participants to the abusive tax shelters, but he knew that he could claim "privilege" over documents sent to his law firm in an effort to prevent (or at least delay) government scrutiny. This conduct deserves the harshest sentence.

### B. Falsely and Fraudulently Inflating the Appraisal Values

"The increase in value . . . cannot be substantiated under any reasonable

4

appraisal methodology, theory or approach."[4]

The false and inflated appraisal values were the engine that made this scheme work. Sen. R. No. 116-44 at 6 (2020) (hereinafter, "Senate Report"). Sinnott provided the fuel.

The appraisal for Crimson Independence provides a stark example. Fisher and Sinnott bought a 99% interest in Crimson Independence on December 29, 2015, for approximately $13.8 million. Gov. Exh. 5-4C. On November 17, 2016, co-defendant Clay Weibel[5] sent Sinnott his discounted cash flow (DCF) for Crimson Independence, reaching an "'as is' fair market value" of the land before the placement of the conservation easement (the "Before Value") of $154,900,000. Gov. Exhs. 47-3, 47-4. The very next day, Sinnott sent Weibel a revised DCF that raised the value by nearly $40 million. Gov. Exhs. 47-5, 47-6. Sinnott provided no reasons for the sudden increase in value in less than 24 hours—a supposed increase in value that alone was more than three times what he and his co-conspirators had paid for

---

[4] Gov. Exh. 64-2 at 3 (Figure 8 (Georgia) LLC's appeal to the Chatham County Board of Assessors). In this appeal, the co-conspirators, wanting to avoid property taxes, challenged the County's 2017 appraised valuation of approximately $27 million. They then turned around and shamelessly told the IRS that a *portion* of the same land was worth $108.5 million just six months later. Gov. Exh. 2-49.

[5] Weibel's acquittal does not bear on the jury's findings that *Sinnott and Fisher* were guilty of all counts, including of aiding and assisting in the filing of false tax returns related to the same Property Company returns. *See also United States v. Maddox*, 803 F.3d 1215, 1220–21 (11th Cir. 2015) (holding that courts can consider acquitted conduct at sentencing). These tax returns were false because the deduction amounts claimed were fraudulently inflated and false.

the property. The final value they provided to the IRS closely resembled Sinnott's revised figures, and together the co-conspirators used these figures to claim a "charitable" deduction of $179,760,000. Gov. Exh. 2-30 at 2.

Sinnott's fingerprints are all over the false and inflated appraised values. He sent the appraisers DCFs, provided target values, and edited appraisals. *E.g.*, Gov. Exhs. 47-5, 47-6, 32-9, 32-11, 23-116, 47-40. He read the appraisals meticulously and provided detailed edits. *See* Gov. Exhs. 5-22, 23-101. Accordingly, he knew that, at the end of the day, whatever appraisal methodology was used—whether it be the sales comparison approach or the income approach (also known as the subdivision method)—the ultimate questions were about the fair market values of the *land* before and after the easement was placed. And he knew that, for their donations, the Before Value was, as the appraisals stated and as Weibel admitted at trial, the price that "a willing buyer should pay a willing seller <u>for the raw vacant land</u> on" the date of the easement. Trial Tr. Sept. 8, 2023, vol. 36 AM at 138:13–22 (emphasis added). It is this Before Value that exposes the defendants' inflated values most blatantly—such as when Fisher and Sinnott bought Inland Bluffton for $3.5 million[6] and then told the IRS that a willing buyer would pay $54 million just *nine*

---

[6] To avoid the IRS's rules on tacking (under which if the defendants had bought the land outright within a year of the donation the deduction would be limited to their cost basis), the defendants bought 98% of the company Inland Bluffton, whose sole asset was the land. *See TOT Prop. Holdings, LLC v. Comm'r of IRS*, 1 F.4th 1354,

*days later.* Gov. Exhs. 5-4C, 2-4 at 5.

### C.    Covering up the Naked Sale of False Tax Deductions

"[L]ooking at it first glance, I mean, that's why we've had investors for years. Say no, no, when we send them the [INDISCERNIBLE] . . . Can you send us the conservation fund? It's like, we're like, dumbass, this is how many times do we have the same basic format? You know, but that also tells us we're doing our job right. Because it's all optics."[7]

Sinnott was in the business of selling tax deductions to high-income taxpayers. Indeed, the only benefit any participant ever received was tax related.[8] The scheme was, and always has been, the naked sale of false tax deductions.[9] Sinnott and Fisher marketed their illegal tax shelters with a 4.5 to 1 write-off ratio. In essence, the defendants' scheme was like a vending machine—for every dollar a

---

1371 (11th Cir. 2021) (calling such a purchase an "overwhelmingly significant fact" and reasoning that "[w]hen the partial interest is a 99% ownership interest and complete control, as here, and when the property is the only asset of the entity (besides $100 cash), it is clear that the parties considered the price paid to be the fair market value of the property").

[7] Gov. Exh. 1-2-E (Sinnott bragging to undercover agent on November 15, 2018, about the co-conspirators' misleading marketing materials).

[8] At first, it was only the immediate tax deduction. After indictment and right before the criminal trial began, four of the Fund Companies also issued small tax distributions to participants, including trial witnesses. *See* Dkt. No. 567, 572.

[9] By law, a transaction (or series of transactions) is disregarded for tax purposes if the transaction lacked "economic substance." A transaction lacks economic substance if either (a) the transaction did not change the participant's economic position in a meaningful way apart from the federal income tax effects, or (b) the participants did not have a substantial purpose for entering into such transaction apart from federal income tax effects. 26 U.S.C. § 7702(o). The jury returned a special verdict, specifically finding Fisher and Sinnott guilty of conspiring to engage in transactions that lacked economic substance. Dkt. No. 739 at 2–3, 5–6.

participant put in,[10] he could expect to receive $4.50 back in tax deductions. The defendants targeted high-income individuals to buy into their scheme, and these wealthy individuals, who should pay taxes at the highest tax rates, were able to claim false charitable deductions from the defendants' vending machine and thus substantially reduce the taxes they owed. It wasn't the defendants who funded this vending machine—it was the U.S. Treasury and, ultimately, American taxpayers.

If the IRS ever found out what they were doing, Sinnott knew, "pretty soon, you've got the whole fund comes tumbling down around everyone's ears." Gov. Exh. 34-1-F-2. So Sinnott worked to deceive the IRS into thinking otherwise. He and his co-conspirators told the IRS that the tax shelters were real estate investments, even though he knew they never intended to develop the land prospectively subject to the easement, nor the residual land in most cases. He knew that the outcome of any "vote" was predetermined by him, Fisher, and their co-conspirators to be the conservation easement option. Gov. Exh. 1-2-E. He knew that they would never have a capital call to raise funds to develop the land, but he included provisions in the promotional paperwork for capital calls so that they had the "optics" of having the ability to seek capital. Gov. Exh. 1-2-F.

Laying bare that they were always going to place a conservation easement on the properties—despite purporting to give participants "options," holding "votes,"

---

[10] In reality, the participants were paying multiples of $25,000 into the machine.

and telling the IRS that there was economic substance to the transactions because the conservation easement was not a foregone conclusion—Sinnott told a land broker that if "Congress [passes] a law that blocks 2018 CE's, . . . it would be an absolute mess and obviously we would have to give all the money back to investors." Gov. Exh. 42-31. That is because, as Sinnott well knew, they could not instead develop the land or sell it at the sky-high false values that they claimed were possible to the IRS.

And Sinnott and his co-conspirators were never going to develop the residual properties either. *E.g.*, Gov. Exh. 37-29 ("While that's unlikely to happen any time in the next 20 years—neither is even developing 4 lots realistically."). When there was land worth developing, Sinnott and Fisher quickly removed it from the Fund. Gov. Exh. 103-3 (contract in which Crimson Independence agreed to sell another Fisher company, Argent Land Holdings, two parcels of land by giving Fisher $1.8 million); Gov. Exh. 103-4 (email from Sinnott describing how they will "spin-off Parcel B" from Figure 8 (Georgia) to another Fisher company).

### D.    Profiting from his Fraud

Not only did Sinnott line his pockets with significant income and assets from selling and executing the illegal tax shelters, but he also sheltered that same income using the tax shelters. He received Friends and Family partnership units in the Funds (for which he did not pay and did not report as income), which allowed him to claim

9

the fraudulent charitable contribution deductions against any income he did report. On his 2013 through 2021 tax returns, Sinnott claimed charitable deductions through the very same tax shelters that he was promoting and orchestrating. Every one of these personal tax returns was false in more than one way. In total, Sinnott reported more than $3,852,761 in false charitable deductions on his personal income tax returns. Gov. Exh. 5-60.

## II. **Procedural Background**

On February 24, 2022, the grand jury returned a superseding indictment charging Sinnott and others. Dkt. No. 28. Trial against Sinnott, Fisher, and Weibel began with jury selection on July 12, 2023. On September 22, 2023, the jury returned a verdict convicting Sinnott and Fisher on all counts and acquitting Weibel. Dkt. No. 739. Sinnott was remanded into custody after trial.

## SENTENCING GUIDELINES

The probation officer correctly calculated the Guidelines.[11] Sinnott and his co-conspirators caused a tax loss to the United States of approximately $443,760,035, and used sophisticated means, setting the base offense level at 36. U.S.S.G. §§ 2T1.9(a)(1), 2T1.4(b)(2), 2T4.1. Sinnott encouraged others to violate the internal

---

[11] Due to their substantively overlapping objections, the Government has separately responded to both Fisher and Sinnott's objections to the Presentence Investigation Reports.

revenue laws, increasing his offense level another two points. U.S.S.G. § 2T1.9(b)(2). Four points were applied because Sinnott was an organizer or leader of a criminal activity involving five or more participants, U.S.S.G. § 3B1.1(a), and two points were added for Sinnott's abuse of a position of trust or use of special skill for his abuse of the attorney-client privilege, U.S.S.G. § 3B1.3. This results in a total offense level of 44 (treated as a level 43, U.S.S.G Ch. 5, Pt. A, (comment. n.2)) and, with Sinnott's Criminal History Category I, results in a Guidelines range of life imprisonment.

### RECOMMENDED SENTENCE

The nature and circumstances of the offense, the need to promote respect for the law, and to afford adequate deterrence, both specific and general, support a substantial prison sentence of at least 28 years.[12]

### I.    Nature of the Offense and Sinnott's Conduct

For the better part of a decade, Sinnott played an integral part in a criminal scheme to organize, market, promote, and sell illegal and abusive tax shelters, fleecing the United States Treasury of hundreds of millions of dollars. To be clear, this is not a case where a misguided individual took an aggressive but ultimately mistaken tax position. This is a case of flagrant dishonesty, of shameless disregard

---

[12] The defendant, trained as an attorney, is not in need of any educational or vocational training, medical care, or other correctional treatment.

for the law. And it began straight away for Sinnott.

The first year Sinnott joined the criminal conspiracy, the tax loss the co-conspirators caused exploded. Sinnott joined forces with Fisher in 2013, and for the 2013 Property Company (Ft. Myers), the defendants created a false and fraudulent $66 million tax shelter—an extraordinary amount, and larger than Fisher's ten prior tax shelters combined. Gov. Exhs. 5-3, 5-16, 34-1-C. The false and inflated appraisal value was so large, in fact, that at the end of the year, Sinnott and Fisher still had a substantial amount of units in their tax shelter that they needed to sell to maintain their promised ratio (of tax deduction to capital contributed) of 4.5 to 1.[13] So, in December 2013, Sinnott created Green Fields Investments, LLC, "an entity set up to hold the unsold—all the units that had not been sold for Inland Capital Investment Fund 2013 that were going to be sold after December 31, 2013, for the 2013 year." Trial Tr. July 26, 2023, vol. 9 AM at 41:17–20. When registering the company with the IRS, Sinnott misleadingly claimed that his then-wife was a member in the company, despite her having nothing to do with it. Trial Tr. July 26, 2023, vol. 9 AM at 57–58, 61; Gov. Exh. 56-56 at 77. Even though the company was registered with the IRS in 2013, the operating agreement and bank account were not created until 2014. Thus, every single Schedule K-1 issued by Green Fields Investment as

---

[13] While there was no legal write-off ratio, Sinnott and Fisher aimed for a 4.5 to 1 ratio in an attempt to avoid IRS scrutiny. *See* Fisher-Agee 26-1 at 20.

part of its 2013 tax return was false. Sinnott not only created Green Fields, knowing it would be a vehicle used in millions of fraudulent transactions and tax returns, he even backdated the operating agreement of Green Fields Investment for Fisher to sign and submit to the bank when opening a bank account in April 2014. *See* Gov. Exh. 56-56.

Not only was Sinnott intimately involved in the backdating, as described above, he was integral to the false and fraudulent appraisals. He fed inflated values to both appraisers and to the authors of the feasibility studies upon which the appraisers supposedly relied. *E.g.*, Gov. Exhs. 32-15, 47-30. And the defendants' claimed values were not just ridiculous, they were offensive. The defendants well knew that the land that they had bought just weeks if not mere days earlier was not suddenly worth tens of millions of dollars more. They knew there were no willing buyers at those prices, but they made the IRS an unwilling one, and they plotted to prevent the IRS from finding out.

Sinnott could have done anything with his life. He was smart and well educated, graduating from SUNY at Geneseo and earning his law degree from the University of Georgia. But Sinnott chose to commit crimes, and he used his skills and training as an attorney to further those crimes. The imprimatur of an attorney on the defendants' illegal tax shelters gave them a greater cover of legitimacy and an ability to shield themselves from scrutiny. During the period when the scrutiny from

the IRS and even Congress was increasing, Sinnott abused the attorney-client privilege to hide evidence of his and his co-conspirators' crimes from the government. As noted above, late participants to the 2018 tax shelter, who were buying units well into 2019, were directed to send their backdated documents through Sinnott & Co. so that Sinnott and Fisher could improperly claim these documents as privileged. Sinnott used his credentials as an officer of the court to cloak his criminal conduct and shroud his fraud behind the attorney-client privilege—such abuse by a member of the bar demands a strong prison sentence.

## II.    **Heightened Need to Deter Sinnott and Others**

Unique to this white-collar case, the defendants were repeatedly warned to stop their criminal conduct. Indeed, the United States has used every tool it possesses to try to stop these illegal tax shelters. Yet, not only did Sinnott and his co-conspirators not heed these warnings, instead, they took even greater efforts to conceal their criminality and to reap greater financial benefit. Based upon his prior conduct, it appears that Sinnott will not stop committing fraud of his own accord. A substantial prison sentence is necessary for both specific and general deterrence. *See United States v. Howard*, 28 F.4th 180 (11th Cir. 2022) ("General deterrence is more apt, not less apt, in white collar crime cases.").

The IRS's efforts to stop the defendants' scheme began with the early audit of Robinson Laurel for tax years 2008 and 2009. When the IRS settled those audits,

however, it merely emboldened Fisher and Sinnott.[14] *Cf.* Gov. Exh. 23-16 (June 25, 2013, email from Fisher to appraiser Terry Roberts stating, "We might as well continue to take it to the IRS"). After all, the strictures of the civil audit process limited the IRS's ability to realize the depths or breadth of the fraud, and the only consequence the defendants faced was monetary—the IRS agreed to reduce the deductions by 40% and 20%, respectively. Gov. Exhs. 50-39 at 73, 50-492 at 20. But since Fisher and his co-conspirators were just making up the values, regardless, this was hardly a deterrent. *See* Trial Tr. July 24, 2023, vol. 7 AM, at 48:15–49:14 (Roberts testifying that he and Fisher had falsely inflated the deductions by 600 to 700%); Gov. Exh. 34-3-G (Fisher stating, "I mean, when you get down to it, these appraisals are all about 30% higher than they should be"); Trial Tr. Aug. 17, 2023, vol. 24 AM, at 77:16–20 (undercover agent recalling Sinnott saying that "we intentionally overshoot our mark a little bit so that we have got room to come back to the right number"). Completely unfazed by the audit results, Fisher and Sinnott even reimbursed their Robinson Laurel clients for the taxes the clients had to pay to the IRS due to the settlement by giving the clients free and discounted units in other illegal tax shelters—and thus, the defendants orchestrated it such that the American taxpayer footed the bill for these audit adjustments. Gov. Exh. 22-32 (spreadsheet of

---

[14] Sinnott joined the conspiracy in 2013. The Robinson Laurel audits were settled in 2014. Gov. Exhs. 50-39 at 73, 50-492 at 20.

clients redeemed through Green Fields Investments); Gov. Exh. 5-6 at 6.

After the Robinson Laurel audits, Fisher and Sinnott were aware of the likelihood of additional civil audits; and eventually, it became not just a likelihood but a near certainty. Nevertheless, they were undeterred, and they doubled down, modifying their business practices to better hide their tracks. As Fisher explained to the whistleblowers in December 2015, they switched from email to using Dropbox to communicate with the appraisers because the IRS would "ask for all the fucking emails now." Gov. Exh. 34-3-D.

In late 2016, the IRS ramped up its enforcement efforts. On December 23, 2016, the IRS issued Notice 2017-10, which designated a deduction obtained via a syndicated conservation easement as a listed transaction. This Notice imposed additional reporting obligations on promoters of and participants in such schemes. The Notice signaled to Sinnott and Fisher that the IRS planned to heavily scrutinize schemes like their abusive tax shelters. Sinnott and Fisher however, were unconcerned. They planned for the audits, cushioning their false valuations even more to allow them to negotiate with the IRS during the audits and still come out ahead. *See* Gov. Exhs. 34-3-G, 1-2-J-3; Trial Tr. Aug. 17, 2023, vol. 24 AM, at 77:16–20. They papered the file with everything they could to overwhelm the IRS, paid people to give the IRS "a big line of bullshit," and made sure their materials conveyed the right "optics" to deceive the IRS. Gov. Exhs. 1-2-J-4, 1-2-H, 34-3-G,

16

1-2-E, 1-2-F. Sinnott bragged about the deceptive nature of their marketing materials, capable of fooling even some of their long-term participants at "first glance," and noted that the IRS "d[id]n't have any budget to really refute our stack of paper . . . ." Gov. Exh. 1-2-E; Gov. Exh. 1-2-H.

Meanwhile, as rumors of a legislative push to turn off the spigot grew, Fisher and Sinnott dialed up their fraud to maximize the money they could reap. To increase their fees and profits, they encouraged participants to overbuy tax deductions, explaining that the participants could carry them forward into future tax years, even if, and after, the law changed. For example, in the waning days of 2017, they opened up a third Fund because they worried Congress might shut down their lucrative scheme in 2018. Trial Tr. July 26, 2023, vol. 9 at 65:20–68:7. That way, they could continue to sell their 2017 abusive tax shelter in 2018, backdating documents to hide what they were doing—and they did so, to the tune of $14.6 million.

By December 2018, Fisher and Sinnott had already created and sold over $800 million in false tax deductions. That month, the Department of Justice, as part of the enforcement effort against these illegal tax shelters, brought a civil lawsuit against a large group of promoters of another conservation easement scheme. Unfazed, Fisher and Sinnott bragged to others that it wasn't against them even as they continued to create, obtain, and hide backdated documents and false appraisals. *See* Fisher-Agee 26-1 at 16, 18–19; *see, e.g.*, Gov. Exhs. 26-7, 42-40, 1-4-C, 1-5-B. By at least the

spring of 2019, Sinnott was abusing the attorney-client privilege to hide documents from the government. Gov. Exh. 47-21 (email dated March 15, 2019).

On March 27, 2019, the Senate Finance Committee announced an investigation into these abusive tax shelters, noting that promoters would "get inflated appraisals of those tracts of land." Fisher-Agee 26-1 at 21. The Committee sent letters to individuals "perceived to [have] unfairly profited from CE." *Id.* at 21–23. Again, Fisher and Sinnott boasted that they were not sent a letter, nor named in the Brookings Institution report dated December 20, 2017, that identified promoters with high write-off ratios—even though the report included professionals that Fisher and Sinnott had closely worked with in designing their misleading and false promotional materials and churning out fraudulently inflated and false appraisals.

At the same time, Sinnott was actively involved in obtaining false and fraudulent appraisals for their 2018 deals. In November 2018, he gave Weibel DCFs containing inflated lot prices and Before Values for both Winnemucca and Storm Crow. Gov. Exhs. 32-10, 32-11, 32-9; *see also* Gov. Exh. 42-34 (Fisher email to Sinnott and others stating, "[W]e need to come up with a plan for the water. If this is examined it will not look good to see this as a barren waste land with respect to future value in the after plan."). He knew these were false numbers. *See* Gov. Exh. 5-4E. At Winnemucca, for example, it would require a change in the zoning—which they were unsuccessful at changing. *See* Gov. Exh. 5-14 (Washoe County Planning

Commission denied the zoning change on February 5, 2019). So, the defendants chose to lie to the IRS about the zoning. *See* Gov. Exh. 2-52 at 52; *see also* Gov. Exh. 2-52 at 43; Gov. Exhs. 37-61, 37-62.

In May 2019, Sinnott and Weibel were directly put on notice that the Storm Crow lot prices were "aggressive" and not supported by even a quick Zillow search. Gov. Exh. 37-84 (criticizing the appraisal for using comparisons to the Bay Area ("notably some of the most expensive real estate in the country") for the remote, rural subject site). They used the lot prices anyway. At trial, a local real estate agent called the appraised value "farfetched," "shocking," and "very high." Trial Tr. Aug. 2, 2023, vol. 14 PM, at 142:20–21.

On November 12, 2019, the IRS issued a press release naming syndicated conservation easement transactions as one of the "Dirty Dozen," representing the "worst of the worst tax scams." *See* Gov. Exh. 26-37 (Dec. 20, 2019, email from Jack Fisher discussing press release).

Even the threat of criminal prosecution was not enough to deter Sinnott. In December 2019, law enforcement officers executed search warrants at the co-conspirators' offices. *Id.* Co-defendant Roberts informed Fisher and Sinnott that he would no longer prepare the appraisal for Bay Creek. Gov. Exhs. 23-121, 23-122. Stein Agee, too, ended his criminal involvement with Fisher and Sinnott. But Sinnott and Fisher did not abandon their plans. They sought out a new appraiser willing to

provide them with a false and fraudulent appraisal. The Senate Finance Committee's report was released on August 25, 2020, identifying characteristic abuses of syndicated conservation easement transactions—inflated appraisals and partnerships that lack economic substance. Despite this, and despite *knowing* they were under criminal investigation, Sinnott and Fisher again submitted false tax returns to the IRS less than a month later, reporting a fraudulently inflated and false $138 million tax deduction. And Sinnott continued to personally profit from their scheme, including claiming false tax deductions on his personal tax returns for tax years 2019 and 2020. *E.g.*, Gov. Exh. 5-59 at 5–6 (showing Sinnott claimed over a million dollars in deductions related to Fisher's conservation easement funds on his 2020 tax return); Gov. Exh. 50-212 (2020 return filed on October 14, 2021, after the Agees' guilty pleas and the Lewis indictment).

Even *after indictment* and facing a criminal trial, Sinnott again claimed false tax deductions on his personal income tax return related to this scheme. After he filed his false personal income tax return for tax year 2020, Sinnott had approximately $872,024 of carryover deductions remaining related to this fraudulent scheme. Gov. Exh. 5-60 at 6. On October 17, 2022—eight months after being indicted—Sinnott filed his 2021 tax return, on which he boldly claimed a charitable deduction of $596,204 based on a carryover from prior years. This carryover deduction was based, at least in large part, on charitable contributions that Sinnott

knew were false, and for which he has since been convicted (Equity Investment Associates, Winnemucca Holdings, and Storm Crow—the 2018 funds). He used this deduction, which he knew to be false, to offset his tax liability *and to claim a refund of nearly $250,000*.

Despite every possible resource expended by the United States to stop the plundering of the Treasury by these illegal tax shelters, Sinnott, Fisher, their co-conspirators, and others were undeterred. The unprecedented level of fraud, illegality, and abuse committed by syndicators of conservation easements, including the defendants, was so great that eventually Congress changed the law. The burden on the United States, and the taxpayers who pay their fair share, however, remains, as hundreds of cases continue to make their way through civil audits and Tax Court. This case is being closely monitored by other promoters and professionals and clients involved in syndicated conservation easements, and a substantial sentence is necessary to deter those who are tempted by these abusive and illegal tax shelters.

## III.    **Enormous Harm to the United States**

It goes without saying that tax offenses are serious, costly, and damaging to our nation's system of taxation. U.S.S.G. Ch. 2, Pt. T, intro. comment. The scale of the loss to the United States caused by the defendants cannot be overstated. The defendants and their co-conspirators sold over $1.4 *billion* in false and fraudulent tax deductions through their syndicated conservation easement scheme to over a

thousand high-income U.S. taxpayers.[15] In so doing, the conspirators fleeced the United States Treasury of over $443 million. A sentence of 336 months' imprisonment (28 years) would be less than a month for every million dollars stolen. White-collar criminals "often calculate the financial gain and risk of loss," *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006), and a just sentence should appropriately reflect the co-conspirators' belief, as explained by Stein Agee, that they were "invincible" and "wouldn't get caught" while carrying out their sustained criminal activity.

The harm was not limited to the stolen money. "These types of abusive tax shelters erode the Nation's tax base and sow pessimism among all Americans about the fairness of our tax laws." Senate Report at 91. Moreover, this type of abusive tax shelter has caused so much harm to the United States that it spawned not just this criminal case, but a Senate Finance Committee investigation, Department of Justice lawsuits, hundreds of civil audits and Tax Court cases, and untold manhours and resources. The defendants sought to take advantage of the overwhelming tide of cases related to this abusive tax shelter. Sinnott crowed, "They don't have any budget to really refute our stack of paper." Gov. Exh. 1-2-H. This Court must discourage others from pursuing the same strategy. *See Howard*, 28 F.4th at 208 (11th Cir. 2022)

---

[15] The defendants claimed $1.3 billion of these false tax deductions after Sinnott had joined the conspiracy in 2013.

("Congress, the United States Sentencing Commission, and this Court have all decided that general deterrence is a critical factor that must be considered and should play a role in sentencing defendants, including those who wear white collars and practice a profession.").

The Government is aware of the significance of its requested term of imprisonment. But it is not the actions of the United States that brought about this event. It is the conduct of the defendant, and his co-conspirators, and their relentless lies, deception, and greed. Sinnott could have stopped at any time, and while it would not have excused his earlier conduct, it would have resulted in lower Guidelines and a lower sentence. In just the last two years of their illegal tax shelters, the defendants claimed nearly half a billion dollars in false tax deductions. But despite increasing government scrutiny, year after year, Sinnott and his co-conspirators decided to do more and more. Another property. Another inflated appraisal. More backdating. Selling more false tax deductions and filing more false tax returns. They did not get to $1.4 billion in false deductions overnight. It was the result of countless conscious, calculated decisions. Such conduct demands a sentence of 28 years' imprisonment. *See United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("[B]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *Martin*, 455 F.3d at 1240.

23

IV.    **Avoiding Sentencing Disparity**

The defendants' fraudulent scheme was in a class by itself. It is impossible to find truly comparable cases—a testament to how egregious the defendants' conduct truly was. Sinnott's offense level (44) is literally off the charts, a level higher than the highest level in the sentencing table. U.S.S.G. Ch. 5, Pt. A, (comment. n.2). Even a top of the Guidelines offense level of 43 is rare, particularly in tax cases.

Given Sinnott's off-the-charts Guidelines offense level, it is virtually impossible that the sentence imposed would somehow result in an unwarranted sentencing disparity. And while the defendants' conduct is unprecedented, the sentence the United States requests is not. In a billion-dollar biofuel tax fraud scheme in which the defendants successfully stole over $511 million from taxpayers, the head of the criminal conspiracy (whose Guidelines offense level was 47 and thus also faced a Guidelines range of life) was sentenced to 40 years' imprisonment. *United States v. Kingston*, 2:18-cr-365 (D. Utah 2023) (other *cooperating* defendants' sentences ranged from 6 to 18 years' imprisonment). In another large tax shelter scheme that caused more than $400 million of tax loss, the lead defendant (who also faced a Guidelines range of life) was sentenced to 180 months' imprisonment, despite being acquitted of some counts. *United States v. Daugerdas*, 1:09-cr-581 (S.D.N.Y. June 25, 2014). *See also United States v. Hill*, 643 F.3d 807, 884–85 (11th Cir. 2011) (affirming reasonableness of defendant's 28-year sentence

for bank fraud and other white-collar offenses in mortgage fraud scheme that caused more than $38 million in direct losses).

A sentence of 336 months—below the Guidelines range of life and far below the statutory maximum sentence that Sinnott faces—is reasonable, just, and not greater than necessary, given Sinnott's unprecedented conduct. If anything, the imposition of such a sentence would affirm the public's belief that those leaders and organizers with special skills who commit the most serious and egregious offenses receive the most serious prison sentences.

## V.    __Restitution__[16]

Under the Mandatory Victim Restitution Act of 1996, restitution is mandatory for Sinnott, who was convicted of 18 U.S.C. § 371 and 18 U.S.C. § 1349. *See* 18 U.S.C. § 3663A. The United States asks that Sinnott be ordered to pay restitution to the IRS in the amount of $443,760,035.

## CONCLUSION

For all the reasons set forth in this memorandum,[17] the United States requests that the Court sentence Sinnott to a term of imprisonment of 28 years.

---

[16] The United States has separately moved for forfeiture and costs of prosecution. The United States also submits that the defendant is a suitable candidate for a fine and defers to the Court's discretion as to the amount.

[17] The United States also incorporates herein its sentencing memorandum as to co-defendant Fisher.

Respectfully submitted,

RYAN K. BUCHANAN
UNITED STATES ATTORNEY

CHRISTOPHER J. HUBER (GA Bar No. 545627)
Assistant United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
(404) 581-6292; Chris.Huber@usdoj.gov

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

*/s/ Jessica A. Kraft*
RICHARD M. ROLWING (OH Bar No. 0062368)
PARKER R. TOBIN (VA Bar No. 91126)
JESSICA A. KRAFT (MI Bar No. P80841)
NICHOLAS J. SCHILLING JR. (IL Bar No. 6327559)
GRACE ALBINSON (NY Reg. No. 4952697)
Trial Attorneys
United States Department of Justice, Tax Division
4Con Building, 150 M. St. NE
Washington, D.C. 20002
(202) 353-9377 (RMR); Richard.M.Rolwing@usdoj.gov
(202) 514-0454 (PRT); Parker.R.Tobin@usdoj.gov
(202) 514-7670 (JAK); Jessica.A.Kraft@usdoj.gov
(202) 514-5886 (NJS); Nicholas.J.Schilling@usdoj.gov
(202) 616-3311 (GEA); Grace.E.Albinson@usdoj.gov

26

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 7.1(D) and 5.1(C), the undersigned hereby certifies that the foregoing United States' Sentencing Memorandum is prepared in Times New Roman, 14-font.

By: _/s/ Jessica A. Kraft_____
     JESSICA A. KRAFT
     Trial Attorney
     U.S. Department of Justice, Tax Division

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of January 2024, this document was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notifications to all counsel of record.


By: *<u>/s/ Jessica A. Kraft</u>_____*
    JESSICA A. KRAFT
    Trial Attorney
    U.S. Department of Justice, Tax Division